Good morning, your honors. Peter Swarth on behalf of appellant Alfonso Villa Guillen. And if I may at the outset reserve three minutes of my time for a possible rebuttal. The appellant in this case is seeking reversal of his conviction, which he entered on his own plea after the denial of his motion to suppress. And we're seeking the court's reversal of that decision to deny his motion to suppress. In that motion to suppress, the court correctly first excluded evidence of an illegal entry without an illegal warrantless entry into Mr. Villa Guillen's home. During which they made certain observations which were then included in the warrant. But then it was after that that the court found that the remaining circumstances, the remaining totality of the circumstances, was sufficient. And we obviously strongly object. The court's ruling that there was sufficient PC was based on three items. Number one, observations of Ms. Gallegos at a truck farm where she allegedly picked up items that may or may not have contained narcotics. Observations the next day at the Anaheim residence of Ms. Gallegos when there was apparently some interaction and meeting with my client, Mr. Villa Guillen, who drove his car, his truck, into Ms. Gallegos' garage where the previous night the truck which was allegedly carrying the items taken from the truck farm had been stored. And Mr. Villa Guillen, however, was in the garage. The garage remained open and visible. Let me ask you a few questions here. It seems here the police had been investigating, I think it was Mr. Castro, for over a year. Correct. And they had surveillance cameras set up around the truck yard. They had wiretaps on members of the Castro organization. And they had seized large amounts of drugs, money, and weapons. All correct. Correct? Okay. Yes. All right. Looking at all these facts together, why isn't that enough to establish the police's belief that the truck yard was being used for trafficking and to connect Mr. Villa Guillen to the tools that were picked up from there? Well, I believe that the police can know what they believe they know about the truck yard. But there was no connection to Mr. Villa Guillen to the truck yard. The observations of Mr. Villa Guillen all the time are he's empty-handed. He's never in possession, never touches what they think may have been containing the narcotics. And I believe what the item was was PVC pipe. They believe that the narcotics was being shipped in and hidden in PVC pipe. Apparently Ms. Gallegos picked up a quantity of PVC pipe. Mr. Villa Guillen was never in contact with PVC pipe or was seen holding anything. But can we call this a bare-bones investigation, which I think you're suggesting, affidavit, because I think you're comparing this to Underwood maybe? I don't mean to say that it's bare bones. This was a full investigation. This was a very large case. And I know that DEA, FBI, everybody, and the local authorities extended full resources on it. So couldn't the magistrate judge or the judge signing off on the warrants say, so much detail here that Mr. Guillen got wrapped up in this? How does he connect Mr. Villa Guillen to what he thinks he knows about Anaheim other than the presence there? No, no, no. I mean, I think you've got to take this case in two stages, and you started by doing that. I think there's unquestionably probable cause to think that Ms. Gallegos brought drugs back to her garage, right? I mean, they had ‑‑ you can ‑‑ I have an allergy to conceding certain facts. That's fine. You're not going to persuade me on that point. I think where you're a little stronger is, okay, well, let's assume that Ms. Gallegos the night before brought drugs when she parked her truck in there. All they have is your client backing his truck in there, and then I guess they can't really see what's going on. That's where you argue they didn't have probable cause to believe that whatever contraband Ms. Gallegos had brought the night before was then transferred into your client's truck, right? Agreed. Agreed. And that is further supported by the absolute absence of any observation of my client in possession of anything. Not only there in Anaheim, but more crucially, after following him with air support. Is your client's truck, is it a covered? It's an open pickup truck. It is? Yes. Okay. It's an open rear pickup truck. And nowhere in the affidavit do the officers say that they observed anything in the bed of the truck? No, they do not. They note that there was air support, that he was followed all the way from Anaheim to Ontario. They never mention observing anything in the truck, and they do very clearly observe he's empty-handed when he leaves the truck. He's not, I mean, I don't know what quantities we're talking about here, but I assume he's not going to be having bails of drugs under his arm. No, I believe that the allegation is that he was carrying, that he was there getting large amounts. Yeah, to put in the truck, not to carry around in it. Yes, but if it wasn't in the truck, how does it get into the pool? That's why I'm saying, to me, that's your case right there. Forget about what happened at the truck yard, because you're going to have to prevail on that. I agree. But let me ask you this. I tried to find the return on the search warrant to see what was found in the truck. Was there anything found in the bed? Nothing. So we know there was nothing in the bed of the truck? There was nothing in the bed of the truck. Okay. And so the assertion by the officer that he believed there was something in the house is based on nothing. Well, I'm sorry, if I could ask one more question, just on the statements that your client makes when he's intercepted. Okay. I know the district court, I think, ended up saying, I'm not even going to try to figure out whether I can rely on those. I guess I looked at our case law, and it seemed like we could. And if we do, it seems to me that that might be enough to tip the balance. Here's the problem with that. Putting – well, I don't want to put aside the possible Miranda violation, because my client was – No, no. Assume there's a Miranda violation. Okay. Assuming the Miranda violation – No, no. Well, okay. Just be clear. I think our case law says, unless you're going to cite me a different case, that even if the statements were taken in violation of Miranda, they can still be used to support probable cause in a search warrant affidavit. That's not my understanding. What case do you have that says to the contrary? I didn't have that case in the frontal lobe this morning. I mean, the case I have in mind is an older case. It's from 1987. That's why I'm asking if you have some better, more recent authority. If I may, may I come back to it? Of course. Oh, I'm sorry. In the reply. Okay. But certainly, I have – if I can, while we're working on the Miranda issue, if I can move beyond that and articulate what I think is the real problem with that statement is it's hopelessly vague and undefined. In the warrant application, Officer Mangarin notes that my client put his head down and said, you know, I have – you'll find stuff. But then he goes on to say he wouldn't elaborate further. What that means is Officer Mangarin said, well, what do you mean? Because he didn't know what it means. It didn't have any meaning. So then to ascribe some meaning to it later is – Well, the context, though, that elicited that, you know, the statement from the officer that elicited that statement from your client is, I mean, you have to admit, he says, we're interested in – I can't remember the exact words, but, you know, this is a narcotics investigation. Basically, you know, we think we've got the goods on you. Your client says, well, how much time am I looking at? And then says, and you're going to find a lot of stuff. And I think actually they say, we're in the process of getting a search warrant for your apartment and your truck. And he says, yeah, you're going to find a lot of stuff in there. What is stuff? Well, in the context of we've got the goods on you for narcotics trafficking. But that's not what they said. They said we're doing a narcotics investigation. Right. We're doing a – And we're – And we're going to – We have enough. What they tell him is we have enough, in our view at least, to get a search warrant both for your apartment and your truck. Now, that obviously in context, it seems to me, they're talking about we are looking for drugs. And your client says, yeah, you're going to find a lot of stuff in my apartment. If I may be a little bit impertinent. I don't mean to be. But I was thinking about just this argument driving down the road the other day. And the analogy that came to mind is I had a bad shoulder. My doctor sent me to a surgeon to see what was wrong. The surgeon came back and said, oh, you need surgery. This officer heard a statement. He's in the course of an investigation. So he sees and hears what he sees and expects to see and hear. And I don't think that it's fair to put that in the context of what the officer had in mind. Because his subjective judgment isn't really relevant here. It's what's objective about what he observed. And I don't see where you can say objectively stuff means anything other than it may indicate some guilty conscience. But it doesn't tell us anything more. It doesn't even say it's contraband narcotics. It could be stolen material. It could be you're going to find a place just overflowing. What we don't have is we don't have tone of voice. So we don't know did my client say sarcastically, well, you're going to find a ton of stuff. Or did he say guiltily, well, you're going to find a ton of stuff. And I think that to impute a particular reading of the emotion in the statement wouldn't be correct. I think we're left with the words. And the words are insufficient on their own. Let's talk about the very last statement he gave. Post-arrest? When he was not arrested until ten months after the searches, which seems like a pretty lengthy amount of time. In light of the facts, there did not appear to be any intervening circumstances in the record. So I'm just trying to figure out why couldn't law enforcement use just that statement that he gave at the very end? Well, I think that there. Why wasn't it independent and unrelated? Because it is initiated and generated by the admonition. We've already got, you can help yourself here. You're already in trouble because of what we found last year. So there is nothing intervening to break the chain of what I think is the improper conduct. There is nothing that allows my client to feel, you know, we're in a separate proceeding here. Thank you. Thank you. You don't have any time, but I'll give you time. I appreciate it. Thank you. I'll need about a minute at least. Morning, Your Honors. Jay Robinson on behalf of the United States, and may it please the Court. Let's just jump into the exchange at the Gallegos garage. Yes, Your Honor. So your guys, not your guys, I'm sorry. The officers, they don't see anything in the back of the truck, and yet there's probable cause to think that there was an exchange that occurred? I think if we go to pages 18 and 19 of the record, specifically, well, starting at the bottom of page 17 and going up to the top of page 18, where the officer, or at least investigator, specifically invokes his past training and experience regarding what he has done with major narcotics investigations. And he says, this may be an offload, this may be a load. And what they see is Ms. Gallegos or someone else drive the same camper that they saw from the truck yard the day before, drive it out that morning, see the defendant, park his truck in there, and leave it there for 45 minutes. And it's there for 45 minutes. Now, he can't forget everything that has been seen the day prior. And so all of what Ms. Gallegos took. I mean, I guess I just want to make sure I'm on the same page with you. I'm assuming that they had probable cause to believe that Ms. Gallegos brought drugs, in whatever form, in the back of her car, truck rather, and parked it there the night before. Presumably they were taken out when she moved her truck out and the defendant's truck was backed in, right? That's correct. That's the scenario. And so then, in order for the officers to have probable cause, I think, to later search his apartment, we have to assume that whatever was offloaded off of Ms. Gallegos' truck was then loaded into Mr. Guillen's truck, right? Well, that's one scenario, Your Honor. The way I read the affidavit, at least in the first paragraph on page 18, it is my expert opinion that in a narcotics transaction that occurred, it is my opinion that Gallegos and the defendant had a prearranged meet and either an offload or a load. Well, but that's really interesting because every inference, or most of the inferences, has been there was this truck yard that was being used for drug trafficking. I mean, there doesn't seem to be any direct statements supporting that other than these conclusions. We've been investigating the Castro people, and now somehow this truck yard has come to our attention. They don't really state how or why, okay? But then they say details about somebody transporting tools. I understand that could be a code word in light of their extensive investigation. We'll assume that's what they mean, okay? All of it is that they're tracking these tools that have gone, you know, to the truck yard that were picked up by, I think, Ms. Gallegos and there's a couple other people involved, correct? That's correct. All right. And then she drives in a black camper or some camper type of truck. Is that correct? That's correct. With another individual back to some house, presumably her house. I don't know. And then presumably these tools are still in there. I mean, that's the inferences that they're trying to have people draw from that statement. Are you trying to say something different? No, Your Honor. Okay. Then follow me, if you would, just for a second. So they go to the house, they're at the house, and they say goodnight. Everybody says goodnight, okay, including the investigators, which I find a little stunning. There's an eight-hour gap in surveillance. We don't know what activity occurred from 11 p.m. to 7.30 a.m. and what could have happened to the tools that I think people are led to believe were in that truck based on the Castro investigation and organization. There's that overnight gap, and then the next morning, you know, after investigators have gone and then come back, they resume surveillance, and then Mr. Gein shows up at some point. Is that correct? That's correct. He parks his car. It's open, okay? The garage is open. They can't close the garage door, okay? He has an open bed truck, and then he drives out of his truck, correct? Yes. All right. No one sees anything put into the truck. Presumably the amount of drugs that people are talking about are large amounts of drugs that are of the tools that were supposedly transported, okay? He leaves. He's being surveyed with the helicopter, and then he stopped. We don't know anything about Mr. Gein. We don't know anything about his attachment. We don't know if he's a good close family friend of Ms. Gallegos, completely non-related. You know, there's I guess some suspicion just by association that's being portrayed out in the affidavit, but what can you link to Mr. Gallegos, and this is the opportunity to do it, that connects him to this drug organization other than his mere presence? Other than his mere presence, Your Honor, when the investigators actually contact him back in Ontario, and they start, as was mentioned earlier, when they start asking him questions. So that's your focus then is when they contact him and stop him on the street. Why did they stop him on the street? Because the investigator believed, based on his training and experience, that what he had seen back in Anaheim. What did he see? He saw, well, as was stated earlier, he saw a truck, Mr. Gein's truck, the defendant's truck back into a garage where his team had seen the day prior what they had thought, a truck driven by a different defendant back into it after it had left a truck yard. And then the surveillance stopped. That's correct. And you don't think that that's significant? Your Honor, it is. Clearly it's an issue. It is significant. But, again, it would be one thing if this were a patrolman right out of the academy who were just driving along and they said, go watch this place and look for anybody who backs their trucks into this garage and let us know. That's not. This is a detective, the affiant, with 25 years of investigative experience investigating major narcotics organizations where he has seen these types, at least as he's recounting it in his affidavit, he has seen these types of organizations and how they move product, how they keep the supply chain going. That is informing what he is seeing on the ground. Despite the fact that no one saw anything transferred into the truck, it's an open bed truck, no one sees anything on his person and no one sees anything in the truck. And he recounted, that's right, and he recounts that earlier in the affidavit where he says where the garage was, it's a separated garage from the apartment. It's difficult to maintain visual contact with, but this is what we saw. And based on the wiretap evidence that we had the day prior and everything that we see on the 16th and the 17th of October, this is my belief as to what has happened based on my training. Maybe you can address the statements. You were going to do that. Your Honor, in terms of his statements, when they contact him on the street, it wasn't as if at least my characterization would be different because I believe in the reply brief the defendant argued that the first time we talked about the incriminating nature of these statements was in our answering brief. That's incorrect. We addressed it in the district court in our opposition to the motion to suppress. But what I would say is when he's asked, we're doing a major narcotics investigation here and it would be in your interest to cooperate, his countenance changed. He drops his head, as it's listed in the affidavit. He drops his head, and the first thing he says is, what kind of time am I looking at? Not, you guys got the wrong guy. I have no idea what you're talking about. It's a declaration against penal interest. What kind of time am I looking at? The follow-on questions are specifically, we're going to search your house. We're going to get warrants for your house. We're going to get warrants for your truck. You're going to find a lot of stuff in there. And I think, as was mentioned earlier, the entire context of that connects him to the yard and to the Ontario house. And you think, I'm going to assume that there was a Miranda violation. Do you have authority that says we can, that that can be relied upon? Your Honor, I would go back to what the district court mentioned in footnote 3 of its memorandum opinion they relied on. I think it was the 1987 case of Patterson, United States v. Patterson. If the court would further briefing on that particular issue, we would be happy to provide that. You don't have any authority other than Patterson? No, sir. Okay. Maybe your opponent will enlighten us with other authority. Possibly. Thank you, Your Honor. Thank you. And if I may get right to that question that I deferred, no, we cited Patterson, which cites favorably Massachusetts v. White, which says that such a statement in violation of Miranda cannot be used. Well, Patterson most definitely says it can be used. But it's relying on Massachusetts v. White saying it can't. Your Honor, we got a case that you're, I guess I was thinking you were going to say that, no, Patterson is now inconsistent with later authority from our circuit or from the Supreme Court. You're not saying that. I read the plain words of Patterson. It says what it says. I don't know. Reasonable minds can differ. No, they can't. Not on what Patterson held. I'm sorry. That's what the case held. I guess I don't have it as deeply as I should at this moment. And I apologize to the Court and to my client for that matter. What I wanted to take my last minute for, if I can, is the one thing that hasn't been addressed is the absolute lack of any nexus between Mr. Villagin's residence and whatever it is they think, the officers think they observed or concluded occurred in Anaheim. I don't think that's a persuasive argument. If they had spotted packages in the back of the truck consistent with, in the past transactions, they'd observed drugs, and so there was probable cause to believe that, in fact, whatever product Gallegos had brought back had been offloaded into your client's truck and they followed him back to the house. I think it's a fair inference to say that he's involved in drug trafficking and that we're likely to find incriminating evidence of some sort. Yes, but they didn't. That's my point. They didn't see him carrying anything. So what is the nexus to his home? Yeah, no, I agree. But it has nothing to do with the nexus to the home. It has to do with the nexus between what Gallegos brought and your client's truck. And I agree, that's the thinnest, that's the weak part for the government. There's no question. If I may, I have just another minute. Well, I don't have anything more. Is there any further questions? No, thank you. Thank you. Thank you both for your arguments. The case of U.S. v. Biagin is now submitted.
judges: Murguia, Watford, Vanaskie